UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY IN ITS CAPACITY AS TRUSTEE OF BBCMS MORTGAGE TRUST 2022-C17, COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2022-C17, acting by and through Argentic Services Company, LP, as Special Servicer,<br><br>Plaintiff,<br><br>v.<br><br>DAVID BENEDICT, DAVID PRINZIVALLI, MICHAEL FORREST, STEVEN CHERIN, and DR. ANANT J. GANDHI, as Sole Trustee of the VGSB Realty Trust, under Irrevocable Trust Agreement, dated August 7, 2020,<br><br>Defendants. | CIVIL ACTION FILE NO. 1:26-cv-2259 |

# COMPLAINT

Plaintiff Wilmington Trust, National Association, not in its individual capacity, but solely in its capacity as Trustee of BBCMS Mortgage Trust 2022-C17, Commercial Mortgage Pass Through Certificates, Series 2022-C17 ("**Plaintiff**"), acting by and through Argentic Services Company, LP, as Special Servicer ("**Special Servicer**") states its complaint against Defendants David Benedict ("**Benedict**"), David Prinzivalli ("**Prinzivalli**"), Michael Forrest ("**Forrest**"), Steven Cherin ("**Cherin**"), and Dr. Anant J. Gandhi, as Sole Trustee of the VGSB Realty Trust, under Irrevocable Trust Agreement, dated August 7, 2020 ("**Gandhi**") (collectively, "**Guarantors**") as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Wilmington Trust, National Association ("**Wilmington Trust**") is a national banking association with its designated main office located in Wilmington, Delaware.

As a national bank, Wilmington Trust is a citizen of Delaware, which again is the site of its main office.

2. Wilmington Trust is the duly appointed and presently serving "Trustee" under the trust (the "**Trust**") created under a certain pooling and servicing agreement dated and effective as of September 1, 2022 (the "**PSA**"), by and among several parties, including but not limited to Barclays Commercial Mortgage Securities LLC, as depositor, KeyBank National Association, as master servicer, and the Special Servicer.

3. Wilmington Trust, not individually, but solely in its capacity as such Trustee under the PSA, acting by and through the Special Servicer, brings this action as Plaintiff with express reference to the Loan (defined below) and the matters related thereto as hereinafter set forth.

4. Based on the loan documents at issue and upon publicly available information, Benedict is domiciled in the State of New York and as such is a citizen of that state for purposes of diversity jurisdiction. Benedict may be served at the following address: 109 Hewlett Neck Road, Woodmere, New York 11598.

5. Based on the loan documents at issue and upon publicly available information, Prinzivalli is domiciled in the State of New Jersey and as such is a citizen of that state for purposes of diversity jurisdiction. Prinzivalli may be served at the following address: 12 Washington Avenue, Warren, New Jersey 07059.

6. Based on the loan documents at issue and upon publicly available information, Forrest is domiciled in the State of Michigan and as such is a citizen of that state for purposes of diversity jurisdiction. Forrest may be served at the following address: 4318 Walnut Woods Drive, West Bloomfield, Michigan 48323.

7. Based on the loan documents at issue and upon publicly available information, Cherin is domiciled in the State of Pennsylvania and as such is a citizen of that state

for purposes of diversity jurisdiction. Cherin may be served at the following address: 2434 Mount Royal Road, Pittsburgh, Pennsylvania 15217.

8. Based on the loan documents at issue and upon publicly available information, Gandhi is domiciled in the State of Pennsylvania and as such is a citizen of that state for purposes of diversity jurisdiction. Gandhi may be served at the following address: 242 Liberty Boulevard, Canonsburg, Pennsylvania 15317.

9. This dispute arises between citizens of different states, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. Therefore, this Court has diversity-of-citizenship jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a)(1).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)&(d), based on the forum selection clause in the guaranty agreement at issue. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 50 (S.D.N.Y. 2020) (finding that parties were subject to a contractual forum selection clause and were "deemed to reside" in the Southern District of New York for the purpose of venue).

## FACTUAL BACKGROUND

### A. The Loan

11. On or about June 22, 2022, Argentic Real Estate Finance LLC, a Delaware limited liability company ("**Original Lender**") made a loan (the "**Loan**") to Evergreen Keokuk, LLC, Evergreen Bronson, LLC, TSM 338 LLC, Evergreen Poplar, LLC, Evergreen Eastwood, LLC, Evergreen Citrus, LLC, Evergreen West Manor, LLC, Evergreen Hummingbird, LLC, Evergreen FMC, LLC, and Evergreen Sugar Creek, LLC, each a Delaware limited liability company (each a "**Borrower**" and collectively, together with their permitted successors and assigns, "**Borrowers**") evidenced by that certain Loan Agreement, dated as of June 22, 2022 (the "**Loan Origination Date**", and such agreement, as amended, restated, replaced,

supplemented or otherwise modified from time to time, the "**Loan Agreement**"), by and between Original Lender and Borrowers. A true and correct copy of the Loan Agreement is attached as **Exhibit 1**. Capitalized terms not defined herein have the meaning assigned in the Loan Agreement and the other Loan Documents, as defined herein.

12. The Loan is also evidenced by that certain Promissory Note, dated as of the Loan Origination Date, in the original maximum principal amount of $14,100,000.00 (as amended, restated, replaced, supplemented, assigned, or otherwise modified from time to time, the "**Note**"), the makers of which are Borrowers. A true and correct copy of the Note is attached as **Exhibit 2**. The Note and Loan Agreement required Borrower to pay interest on the outstanding principal balance every month through July 5, 2022, and then beginning on August 6, 2022, to make a monthly payment of principal and interest in the amount of $86,907.85 until the maturity date, and then pay the full principal balance on the Stated Maturity Date. Ex. 1, §§ 2.2.1, p. 21-22 & 2.1, p. 21.

13. As an inducement for Original Lender to make the Loan, Guarantors signed and delivered to Original Lender that certain Guaranty of Recourse Obligations (the "**Guaranty**"), dated as of the Loan Origination Date. A true and correct copy of the Guaranty is attached as **Exhibit 3**.

14. The Loan Agreement, Note, and the Guaranty and all other documents further evidencing, securing or executed in connection with the Loan at origination are collectively referred to as the "**Loan Documents**."

15. Original Lender assigned its interest in the Loan and Loan Documents to SPREF WH II LLC, a Delaware limited liability company, ("**SPREF**") by executing and delivering certain instruments to SPREF, including an Omnibus Assignment, effective July 12, 2022 (the "**Omnibus Assignment**"). A copy of the Omnibus Assignment is attached hereto as **Exhibit 4**.

16. SPREF thereafter assigned its interest in the Loan and Loan Documents back to Original Lender, by executing and delivering certain instruments, including a General Assignment, dated September 8, 2022 ("**Omnibus Assignment to Original Lender**"). A copy of the General Assignment to Original Lender is attached hereto as **Exhibit 5**.

17. Original Lender then assigned its interest in the Loan and Loan Documents to Plaintiff by executing and delivering certain instruments, including a General Assignment from Original Lender to Plaintiff, dated September 8, 2022 ("**General Assignment to Trust**"). A true and correct copy of the General Assignment to Trust is attached hereto as **Exhibit 6**.

18. As a result of these assignments, Plaintiff is the successor-in-interest to the Original Lender with respect to all rights, claims, and remedies under the Guaranty and is the sole and proper party to enforce the Guarantors' obligations.

**B. The Guaranty**

19. Pursuant to § 2(a) of the Guaranty, each Guarantor absolutely and unconditionally guaranteed prompt and unconditional payment when due of the "Guaranteed Obligations."

20. Section 1(b) of the Guaranty defines the term, "Guaranteed Obligations," to include "(i) Borrowers' Recourse Liabilities …" Ex. 3, § 1(b).

21. Section 10.1(e) of the Loan Agreement provides that the following act constitutes a Borrower Recourse Liability (a "**Misappropriation Event**"):

> (e) **the misapplication, misappropriation or conversion of Rents and other gross revenues of any Property received or collected by or on behalf of any Borrower after an Event of Default and not applied to payment of Principal and interest due under the Note**, and to the payment of actual and reasonable operating expenses of such Property, as they become due or payable or otherwise turned over to Lender upon demand (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar

> judicial proceeding in which such Borrower is legally prevented from directing the disbursement of such sums);

Ex. 1 at 86 (emphasis added).

22. Section 10.1(i) of the Loan Agreement provides that the following act constitutes a Borrower Recourse Liability (a "**Potential Lien Event**"):

> (i) **the failure to pay charges for labor or materials or other charges that can create Liens on any portion of any Property [securing the Loan]**, provided, the failure to pay such charges shall exclude all instances in which the Rents generated by such Property and made available to Borrower after application of the Rents in the order of priority required under the Loan Documents during the applicable period in question are insufficient to pay for such charges and provided, further, that nothing in this subsection shall be deemed to require any constituent owner of any Borrower to contribute cash or other equity to provide Borrower with funds sufficient to pay the amounts referenced in this subsection;

Ex. 1 at 86 (emphasis added).

23. Section 10.1(n) of the Loan Agreement provides that the following act constitutes a Borrower Recourse Liability (an "**Enforcement Frustration Event**"):

> (n) any litigation or other legal proceeding related to the Debt filed by, or **any other act or omission by, Borrowers, Guarantors** or any Affiliates of the foregoing **that delays, opposes, impedes, obstructs, hinders**, enjoins or otherwise interferes with **or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein or in any other Loan Document or to realize on any Collateral for the Loan**, including, without limitation, the assertion by any of the foregoing Persons of any defenses (other than defenses raised in good faith) or counterclaims against Lender;

Ex. 1 at 87 (emphasis added).

24. Section 10.1 of the Loan Agreement, further provides, in pertinent part, as follows:

> Exculpation. **Subject to the qualifications below, Lender shall not enforce the liability and obligation of any Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against such Borrower, Guarantor** . . . (collectively, the "<u>Exculpated Parties</u>"), . . . . Lender, by accepting the Note and the other Loan Documents, shall not sue for, seek or demand any deficiency judgement against Borrower or any of the Exculpated Parties in any such action or proceeding under or by reason of or under or in connection with the

> Note or the other Loan Documents. **The provisions of this Section 10.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; . . . or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrowers (or Guarantor pursuant to the Guaranty), by money judgment or otherwise, to the extent of any actual loss, actual damage, actual cost and expense, liability, claim or other obligation incurred by Lender** (including reasonable attorneys' fees and costs reasonably incurred) arising out of or in connection with [any Borrowers' Recourse Liabilities]."

Ex. 1 at 84-85.

25. The Guaranty provides that it is governed by the laws of the State of New York. Ex. 3, § 9(a).

26. The Guaranty further provides, among other things, that this Court has jurisdiction over any action or proceeding against Guarantors. Ex. 3, § 9(b).

27. Sections 2(c) and 16 of the Guaranty require Guarantors to "indemnify, defend, and save [Plaintiff] harmless" against, among other things, all costs, losses, damages, and "expenses (including reasonable attorneys' and disbursements)" incurred by Plaintiff and to pay interest at the Default Rate under the Loan Documents. Ex. 3, §2(c) & 16.

28. The Loan Agreement defines the term, "Default Rate," as a "rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent above the Interest Rate, compounded monthly." Ex. 1 at 4.

29. The Loan Agreement provides that the "Interest Rate" is "equal to 6.260% per annum (or, when applicable pursuant to this Agreement or any other Loan Document, the Default Rate)." Ex. 1 at 7.

30. Under New York law, as codified at CPLR § 5001, prejudgment interest accrues on contract claims from "the earliest ascertainable date the cause of action existed."

31. Under New York law, as codified at CPLR § 5004, the prejudgment interest rate is nine percent per annum; however, New York law allows parties in commercial contracts to "contract for a rate of interest above that prescribed by § 5004 of the CPLR."

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 875 F. Supp. 165, 176 (S.D.N.Y. 1994) (citing state court cases).

32. Plaintiff seeks to recover such interest at the maximum amount permitted under New York Law, up to the contracted Default Rate of 11.260% per annum, running from the date of default and compounded monthly.

33. The Guaranty contains a broad waiver of defenses, including, but not limited to, the need for Plaintiff to first exhaust remedies against Borrowers or any collateral.

34. Under Section 17 of the Guaranty, "[e]ach Guarantor shall have joint and several liability for the obligations of the Guarantors." Ex. 3, § 17.

**C. Borrowers' and Guarantors' Defaults Under the Loan Documents**

35. Borrowers have defaulted under the Loan Documents, by among other things, failing to pay in full all amounts due under the Loan Documents on or before the monthly payment date occurring in October 2025 (the "**Initial Payment Default**"), and each subsequent monthly payment date since October 2025 (together with the Initial Payment Default, the "**Payment Defaults**"). Each of the Payment Defaults constituted a separate "Event of Default" under the Loan Documents.

36. On October 30, 2025, Plaintiff, acting through counsel, sent a notice ("**Notice of Default**") to Borrowers notifying them of the Initial Payment Default. A true and correct copy of the Notice of Default is attached hereto as **Exhibit 7**.

37. On November 12, 2025, Plaintiff's counsel notified Borrowers and Guarantors of the Payment Defaults and accelerated the Loan (the "**Notice of Acceleration**"). Pursuant to the Notice of Acceleration, all amounts due under the Loan Documents became immediately due and payable. A true and correct copy of the Notice of Acceleration is attached hereto as **Exhibit 8**. To date, Borrowers have not cured their default by paying all amounts due under the Loan Documents in full.

38. On December 3, 2025, Plaintiff, through counsel, provided Borrowers with a further written notice (the "**Cash Management Demand**") expressly reiterating that, pursuant to the Loan Agreement and Notice of Default and Notice of Acceleration, a "Cash Management Period" had commenced and was continuing as a result of the uncured Payment Defaults. The Cash Management Demand specifically advised that, consistent with the terms of the Loan Agreement, Borrowers were obligated to immediately establish the Cash Management Account, to deposit all Rents and income from the collateral properties into such account, and to deliver to Lender all Rents collected after the date of default. The Cash Management Demand further demanded that Borrowers comply with all cash management procedures set forth in the Loan Documents, and warned that failure to turn over all "Excess Cash Flow Funds" (as defined in the Cash Management Demand) and other Rents would result in recourse liability under Section 10.1(e) of the Loan Agreement for the misapplication, misappropriation, or conversion of such funds. A true and correct copy of the Notice of Acceleration is attached hereto as **Exhibit 9**.

39. On January 8, 2026, Plaintiff, through counsel, delivered a further written notice to Borrowers and Guarantors (the "**Second Cash Management Demand**") again demanding full compliance with the Loan Agreement's requirement that Borrower surrender all Rents collected at the Property. The Second Cash Management Demand reiterated that, because of the continuing payment defaults and the previously declared Cash Management Period, all Rents collected after the Initial Payment Default were required to be delivered to Lender. The Second Cash Management Demand specifically identified Borrowers' willful failure and refusal to comply with Lender's repeated demands for turnover of Rents and other income, and expressly invoked Section 10.1(e) of the Loan Agreement, warning that such conduct would subject Borrowers and Guarantors to recourse liability for misapplication, misappropriation, or conversion of Rents and all resulting losses, costs, fees (including attorneys' fees), and damages.

A true and correct copy of the Second Cash Management Demand is attached hereto as **Exhibit 10**.

40. Despite Plaintiff's issuance of the Notice of Default, Notice of Acceleration, Cash Management Demand, and Second Cash Management Demand, Borrowers and Guarantors have failed and refused to deliver to Lender the Rents collected from the collateral properties after the Event of Default, in direct violation of Section 3.1 and related provisions of the Loan Agreement. This ongoing failure constitutes one or more Misappropriation Events, subjecting Borrowers and Guarantors to liability under Section 10.1(e) of the Loan Agreement, which provides for recourse in the event of "misapplication, misappropriation or conversion of any Proceeds paid to Borrowers by reason of any...sum or payment attributable to any Property received by Borrower and not applied in accordance with the provisions of the Loan Documents."

41. Based on the Borrowers' financial statements, as of September 30, 2025 (the "**Financial Statement Date**"), a true and correct copy of which is attached hereto as **Exhibit 11**, the median monthly gross Rents for the portfolio for the twelve months preceding the Statement Date was approximately $235,997.15 per month. Approximately five months have elapsed from the date of the first Event of Default (October 6, 2025) until the filing of this Complaint. Therefore, Plaintiff estimates the total amount of gross Rents withheld by Borrowers to be at least $1,179,985.75, such amounts to be proven more particularly at trial, (the "**Estimated Gross Rents**").

42. Based on Borrowers' accounts payable statement, dated as of the Financial Statement Date, a true and correct copy of which is attached hereto as **Exhibit 12**, Borrowers have accrued $299,943.23 in unpaid trade and vendor charges for labor and services (the "**Trade Payables**"). In each of the states where the Properties are located, service providers are

generally entitled to place liens on property for unpaid charges for labor or services related to the property. The accrual of the Trade Payables constitutes one or more Potential Lien Events.

43. As a result of the foregoing Events of Default, Plaintiff sought to exercise its remedies under the Loan Agreement by commencing receivership actions and foreclosure proceedings in several states, including but not limited to Illinois, Michigan, and Ohio, where Borrowers own and operate certain real property, improvements, and other assets securing Borrowers' obligations under the Loan Documents.

44. Borrowers have refused to cooperate or acknowledge service of process, despite Plaintiff's requests, constituting one or more Enforcement Frustration Events.

45. The Loan Agreement and Guaranty specify events that will trigger recourse liability under the Loan Agreement and Guaranty. Such events triggering recourse liability include, but are not limited to the occurrence of any Misappropriation Event, Potential Lien Event, or Enforcement Frustration Event.

46. The Borrowers and Guarantors have triggered recourse liability due to the occurrence of one or more Misappropriation Events, Potential Lien Events, and Enforcement Frustration Events.

47. Borrowers have failed to pay their financial liabilities that were triggered because of the foregoing events.

48. Guarantors have also failed to pay such obligations under the Guaranty.

49. Guarantors' failures to pay constitute breaches of the Guaranty.

50. As a proximate result of Borrowers' and Guarantors' breaches, Plaintiff has incurred damages. As of March 10, 2026, Guarantors owe the following amounts: the Estimated Gross Rents, plus any such additional gross Rents which continue to accrue (the "**Gross Rent Cure Amount**"), an amount equal to the Trade Payables, or such greater amount necessary to satisfy all Trade Payables and prevent the imposition of any liens on any of the

Properties (the "**Lien Cure Amount**"), plus Plaintiff's enforcement costs. Through March 17, 2026, Plaintiff has incurred no less than $205,614.68 in reasonable costs and fees in enforcing the Borrowers' and Guarantors' obligations. Plaintiff's attorneys' fees will continue to accrue through the entry of judgment. Prejudgment interest continues to accrue on the outstanding principal balance and the attorneys' fees at 11.260% per annum, compounded monthly from October 6, 2025 through the entry of judgment.

51. Plaintiff is entitled to a judgment against Guarantors, jointly and severally, for the foregoing amounts.

52. All conditions precedent have been performed or waived.

**COUNT I**
**(Breach of Guaranty)**

53. Plaintiff realleges and incorporates by reference, as if set forth fully herein, the allegations contained in paragraphs 1 through 46 of this Complaint.

54. The Guarantors made, executed, and delivered to Original Lender the Guaranty and unconditionally guaranteed the payment of the "Guaranteed Obligations," as described in the Guaranty.

55. Plaintiff is the current holder of the Guaranty and therefore has standing to enforce its terms.

56. The Loan Agreement and Guaranty constitute legal contracts under New York law.

57. Both the Loan Agreement and Guaranty are governed by New York law.

58. Borrowers have failed to pay their obligations under the Loan Agreement.

59. The Loan Agreement and Guaranty specify that the occurrence of any Misappropriation Event, Potential Lien Event, or Enforcement Frustration Event will trigger recourse liability under the Loan Agreement and Guaranty.

60. One or more Misappropriation Events have occurred due to Borrowers' failure to turn over the Estimated Gross Rents.

61. One or more Potential Lien Events have occurred due to Borrowers' failure to pay the Trade Payables, where the related Trade Payable vendors are entitled to place liens on the Properties to secure payment for their labor and services.

62. One or more Enforcement Frustration Events have occurred due to Borrowers' failure to accede to Lender's request that Borrower confess to service of process (or consent to any equivalent such procedure in any state where any Property is located), resulting in delays to Lender's enforcement and receivership actions and increased enforcement expenses.

63. Borrowers have failed to pay their financial liabilities that were triggered because of the foregoing events.

64. Guarantors have also failed to pay such obligations under the Guaranty.

65. Guarantors' failures to pay constitute breaches of the Guaranty.

66. As a proximate result of Borrowers' and Guarantors' breaches, Plaintiff has incurred damages. As of March 10, 2026, Guarantors owe the following amounts: the Gross Rent Cure Amount (at least $1,179,985.75), the Lien Cure Amount (at least $299,943.23), plus Plaintiff's ongoing enforcement costs. Through March 17, 2026, Plaintiff has incurred no less than $205,614.68 in reasonable costs and fees in enforcing the Borrowers' and Guarantors' obligations. Plaintiff's enforcement costs (including reasonable attorneys' fees) will continue to accrue through the entry of judgment. Prejudgment interest continues to accrue on the outstanding principal balance and the attorneys' fees at the maximum rate permitted by law, compounded monthly from October 6, 2025 through the entry of judgment.

67. Plaintiff is entitled to a judgment against Guarantors, jointly and severally, for the foregoing amounts.

**COUNT II**
**(Recovery of Lender's Enforcement Costs)**

68. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1 through 46 of this Complaint.

69. Under the Guaranty, Guarantors are obligated to pay Plaintiff's fees and collection costs (including reasonable attorneys' fees) incurred by Plaintiff to enforce the Loan Documents, including the Guaranty. Through March 17, 2026, Plaintiff has incurred no less than $205,614.68 in reasonable costs and fees in enforcing the Borrowers' and Guarantors' obligations. Plaintiff's enforcement costs (including reasonable attorneys' fees) will continue to accrue through the entry of judgment. Prejudgment interest continues to accrue on the outstanding principal balance and the attorneys' fees at the rate of 11.260% per annum, compounded monthly from October 6, 2025 through the entry of judgment.

70. Plaintiff is entitled to judgment against Guarantors, jointly and severally, for the fees and collection costs incurred by Plaintiff in connection with enforcing the Loan Documents, including the Guaranty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A. That the Court enter judgment in favor of Plaintiff and against Guarantors, jointly and severally, for breach of the Guaranty;

B. That the Court enter judgment in favor of Plaintiff and against Guarantors, jointly and severally, for payment of the Gross Rent Cure Amount, the Lien Cure Amount, all related pre-judgement interest, and the Plaintiff's enforcement expenses, including reasonable attorneys' fees, incurred in enforcing the Loan Documents and in collecting the amounts owed under the Guaranty;

C. That this Court tax all costs against Guarantors, jointly and severally; and

D. That this Court award such other and further relief as is just and proper.

Dated: New York, New York
March 18, 2026

*KILPATRICK TOWNSEND & STOCKTON LLP*
Counsel for Plaintiff

By: /s/ Evan S. Nade
Evan S. Nadel
3 Times Square
New York, NY 10036
(212) 775-8700
enadel@ktslaw.com